Public Storage Inc

300 Treat Ave

San Francisco, CA 94110

415-523-7825

CLERK US DISTRICT COURT
NORTHERN DIST. OF TX
FILED

2023 JAN -4 PM 2: 23

DEPL CLERK

Jeral & Beyonce Carter Henderson

1822 Young Street

Dallas, Texas 75201

C/O Stew Pot Inc

Lawsuit

01/04/2023

3-23CV0020-S

Clerk of Court FBI hit on computer had to move #18

Raymond has been reported to Fort Worth Postal Inspector General Legal Shield, Leave You Gang Members Medical Van resfued to see me Oak Street Health and Doctor Smith time 5:30 PM I was very sick threw up Rule 611 Mode and Order of Examining Witnesses and Presenting Evidence NFL Player that was almost killed on NFL Field! **(a) Control by the Court; Purposes.** The court should exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to: **(1)** make those procedures effective for determining the truth; time has been wasted Mrs Beyonce Carter Henderson and Ms Annette Sumlin we will take care of her Binky Henderson and JerDadrain Henderson! **(3)** protect witnesses from harassment or undue embarrassment. **(b) Scope of Cross-Examination.** Cross-examination should not go beyond the subject matter of the direct examination and matters affecting the witness's credibility. The court may allow inquiry into additional matters as if on direct examination. **(c) Leading Questions.** Leading questions should not be used on direct examination except as necessary to develop the witness's testimony. Ordinarily, the court should allow leading questions: **(1)** on cross-examination; and **(2)** when a party calls a hostile witness, an adverse party, or a witness identified with an adverse party. Henry-v- Clay 274,2d,545,3,O&GR 173 (okla 1954-2023) Rehearing Denied July 28, 1954.

Application for Leave to File Second Petition for Rehearing Denied October 10, 1954.

*546 Hughey Baker, Tulsa, Young, Young & Young, Sapulpa, for plaintiff in error.

Davenport & Allen, Sapulpa, for defendants in error.

WILLIAMS, Justice.

The parties hereto are referred to herein as they appeared in the trial court.

Plaintiffs, Henry Clay and E.E. Clay, filed there petition herein seeking to quiet their title to a certain oil and gas lease as against the defendant, Wat Henry, who held a prior lease on the same premises.

Defendant leased the premises in question for oil and gas purposes on October 27, 1949. The term of the lease was one year, "and so long thereafter as oil or gas or either of them is produced from said land by lessee". Production was obtained during and after the primary term of the lease. Plaintiffs obtained a lease on the same land on June 20, 1952.

It is plaintiff's position that defendant's lease had expired for want of production in paying quantities.

At the conclusion of the trial, the trial court found that defendant's lease had expired at the termination of the primary term thereof for want of production in paying quantities and rendered judgment for plaintiffs, and defendant appeals.

This court is committed to the doctrine that when an oil and gas lease provides that it shall remain in force and effect for a certain term and so long thereafter as oil or gas is produced, the term "produced" means produced in paying quantities. The term "paying quantities" in such case means paying quantities to the lessee. If the well pays a profit even though small, over operating expenses, it produces in paying quantities, though it may never repay its costs, and the operation as a whole may prove unprofitable. Ordinarily the phrase is to be construed with reference to the operator, and by his judgment, when exercised in good faith. Gypsy Oil Co. v. Marsh, 121 Okl. 135, 248 P. 329, 48 A.L.R. 876; Pine v. Webster, 118 Okl. 12, 246 P. 429; Walden v. Potts, 194 Okl. 453, 152 P.2d 923.

In the case at bar, in order that defendant might be vested with a limited estate for further development, it was incumbent upon him to discover oil or gas in paying quantities on or before October 27, 1950, which was the date of expiration of the original term of the lease. This brings us to the question of whether or not oil or gas was discovered in paying quantities before the expiration of the original term of the lease.

The evidence reveals that a well was brought in in February, 1950, and that between that time and October 27, 1950, it produced at least 256.1 barrels of oil which brought a net price, after tax, of $634.68. The defendant operator's 7/8ths of this net would be $555.34. The evidence with respect to the operating cost during this period is somewhat in conflict, but it was shown that a pumper was employed at all times at a cost of $25 per month and that other incidental expenses would run anywhere from $5 to $15 per month. If we accept as correct the maximum amount of expense contended for by plaintiff, or $40 per month, the total operating expense for the 9 month period of February through October, 1950, would only be $360. Since the operator's share of the oil sold during this period was $555.34, it is apparent that there was a net profit over operating expenses to the defendant operator in the amount of $195.34. Oil was therefore discovered and produced in paying quantities prior to the expiration of the original term of the lease, and such lease therefore did not expire under its own terms at the end of the primary term.

Plaintiffs contend that the method used herein to determine whether the production was in paying quantities is fallacious. Suffice it to say, however, that the method suggested by plaintiffs does not take into account *547 at all the large initial production of the well in question, and the method we have

adopted herein is that used and approved by the Federal Court in the well reasoned opinion in the case of Denker v. Mid-Continent Petroleum Corp., 10 Cir., 56 F.2d 725, 84 A.L.R. 756.

The finding of the trial court that the lease of the defendant Wat Henry expired at the end of the primary term for non-production is clearly in error, oil having been discovered and produced in paying quantities prior to the expiration of the primary term of the lease. Defendant then became vested with a limited estate in the leased premises for further operations in accordance with the terms of the lease. Such limited estate however is in the nature of a determinable one and exists only so long as oil or gas continues to be produced in paying quantities. Gypsy Oil Co. v. Ponder, 92 Okl. 181, 218 P. 663. It therefore becomes necessary to determine whether oil or gas was still being produced in paying quantities at the time of the institution of this suit on October 17, 1952, since if such production had ceased at any time prior to that date defendant's lease would have expired by its own terms and the judgment of the trial court would be correct, even though it incorrectly determined the date of such expiration. The evidence in this regard is far from satisfactory, but the following facts may be fairly gleaned therefrom. A well was brought in by defendant on the premises in question in February of 1950. When the well came in it flowed strongly with considerable quantities of gas and oil. Such flow continued for only a brief time, however, and the well was then placed on a pump and has been pumped continuously ever since except for brief periods of normal breakdown and repairs. The evidence does not reveal the exact amount of oil and gas produced by this well up to the date this suit was filed. It does reveal that the total amount received for the oil sold to that date was the sum of $1,031.97, of which the defendant's share was 7/8ths of this or $902.97. It also appears that there had been some small amount of oil produced which had not been sold and that although no gas had been sold, sufficient gas was produced to be used by defendant in the drilling of another well. It therefore appears that although we are unable to determine the exact value of defendant's share of the oil and gas produced at the time of the filing of this suit, it would be slightly in excess of the sum of $902.97 actually received by him.

With regard to the total operating cost to the date of filing of this suit, again we are not favored with the exact amount thereof by the evidence adduced at the trial. It definitely appears, however, that the pumper was paid the sum of $25 per month, continuously, and was first employed on or about February 20, 1950. The expense of employing the pumper was therefore approximately $800. It further appears that there were various incidental expenses of operation during the period in question, but the exact amount is not shown. The defendant testified that such expenses totalled the sum of $56 for the year 1951. There is no evidence as to the amount of such expense for the pertinent portion of the years 1950 and 1952, however, except testimony to the effect that defendant had previously stated that such expenses ran from $10 to $15 per month, which was offered as an admission against interest. The expense for the year 1951 of $56 would be an average monthly expense of $4.66. If we accept this monthly average as being fairly representative of the entire period in question and multiply it by the total number of months involved, which is approximately 32, we arrive at a total operating incidental expense of $149.12, which when added to the pumper's salary, makes a total operating cost of $949.12. This sum is, of course, $46.15 more than the total amount actually received from the sale of oil by the defendant operator. Thus, it might seem that the well had not paid a profit over operating expenses at the time this suit was filed. Such computation, however, does not take in to account the oil produced and on hand but not sold as of that date, nor the value of any gas produced and used. We have no way of determining the amount of these items from the evidence, although it does appear that there were at least 15 barrels of oil on hand but *548 not sold. Since the difference between the known income and expense is so small and the

amount of some pertinent items is unknown, we are not willing to say that the well in question had not paid the defendant operator any profit at all. In the case of Okmulgee Supply Corporation v. Anthis, 189 Okl. 139, 114 P.2d 451, we held that the lessee could remove his equipment from the lease only after the lease could be no longer profitably operated, and that the lease could be profitable when, by the exercise of due diligence and skill, the value of the lessee's part of the oil and gas produced exceeded the cost of operation. We further held that the standard by which the judgment and good faith of the lessee is measured is whether the lease is producing, or by the exercise of reasonable skill and diligence could be made to produce, sufficient oil and gas to justify a reasonable and prudent operator in continuing the operation thereof. It is a poor rule that does not work both ways. Having held that the operator is under a duty to continue production if by the exercise of reasonable skill and diligence the well could be made to produce sufficient oil and gas to justify a reasonable and prudent operator in continuing the operation thereof, we believe the operator should have the right to continue production under the same circumstances. The exact amount and value of oil or gas produced by any well is, of course, purely speculative prior to the actual production and sale thereof. We do not believe that the operator, being under a duty to produce and pay the cost incident thereto from his own pocket, must do so at his further peril of forfeiting his entire investment therein should the total cost of production at any particular time slightly exceed the actual returns to him.

It should also be borne in mind that this is an equitable matter, and we are not impressed with the equities in behalf of plaintiff. The following facts are substantially without contradiction in the record:

1. This is an action between two lessees and the lessors are not parties hereto. The lessors have never made any complaint concerning the operation of the lease by defendant and have never indicated that they considered defendant's lease terminated. Furthermore, one of the lessors has been, and apparently still is, employed by defendant as a pumper on the lease involved, and the lessor owning 1/3rd of the surface rights and living on the premises in question, accepted a check for location damages for the drilling of a second well by defendant as late as December 31, 1952.

2. Plaintiffs took their lease with notice that the premises concerned were occupied by defendant in accordance with his lease; they caused inquiry to be made of him as to how much it would take to purchase his lease, but did not pursue their inquiry and made no offer of purchase.

3. Defendant has at all times since production was first obtained during the primary term of his lease been in actual possession of the lease, operating it and producing from it in varying quantities.

4. There was some evidence that at least two of the lessors, at the time they signed plaintiffs' lease, were led to believe or were allowed to believe, that plaintiffs had bought or were buying defendant's interest.

5. Plaintiffs paid no consideration whatsoever, for their leases or extensions thereto, whereas defendant had paid substantial sums to acquire his lease and had further expended substantial sums in drilling, outfitting and treating the well in an effort to obtain paying production.

6. Plaintiffs' verified petition herein alleges that plaintiffs are in possession of the land described therein, and the evidence discloses that plaintiffs were not and had never been in possession of said premises, but that defendant had at all times been in possession thereof.

Under the evidence in this case, we believe the court erred in quieting plaintiffs' title and enjoining defendant from going on the premises involved.

The judgment of the trial court is reversed.

HALLEY, C.J., JOHNSON, V.C.J., and WELCH, CORN, DAVISON, and O'NEAL, JJ., concur.

BLACKBIRD, J., concurs in conclusion.

**Notes I shouldn't have to come to Court Dallas Downtown Post Office**

(Pub. L. 93–595, §1, Jan. 2, 1975, 88 Stat. 1936; Mar. 2, 1987, eff. Oct. 1, 1987; Apr. 26, 2011, eff. Dec. 1, 2011.)

Notes of Advisory Committee on Proposed Rules, *Subdivision (a)*. Spelling out detailed rules to govern the mode and order of interrogating witnesses presenting evidence is neither desirable nor feasible. The ultimate responsibility for the effective working of the adversary system rests with the judge. The rule sets forth the objectives which he should seek to attain. Item (1) restates in broad terms the power and obligation of the judge as developed under common law principles. It covers such concerns as whether testimony shall be in the form of a free narrative or responses to specific questions, McCormick §5, the order of calling witnesses and presenting evidence, 6 Wigmore §1867, the use of demonstrative evidence, McCormick §179, and the many other questions arising during the course of a trial which can be solved only by the judge's common sense and fairness in view of the particular circumstances. Item (2) is addressed to avoidance of needless consumption of time, a matter of daily concern in the disposition of cases. A companion piece is found in the discretion vested in the judge to exclude evidence as a waste of time in Rule 403(b). Item (3) calls for a judgement under the particular circumstances whether interrogation tactics entail harassment or undue embarrassment. Pertinent circumstances include the importance of the testimony, the nature of the inquiry, its relevance to credibility, waste of time, and confusion. McCormick §42. In *Alford v. United States*, 282 U.S. 687, 694, 51 S.Ct. 218, 75 L.Ed. 624 (1931), the Court pointed out that, while the trial judge should protect the witness from questions which "go beyond the bounds of proper cross-examination merely to harass, annoy or humiliate," this protection by no means forecloses efforts to discredit the witness. Reference to the transcript of the prosecutor's cross-examination in *Berger v. United States*, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935), serves to lay at rest any doubts as to the need for judicial control in this area.

The inquiry into specific instances of conduct of a witness allowed under Rule 608(b) is, of course, subject to this rule.

*Subdivision (b).* The tradition in the federal courts and in numerous state courts has been to limit the scope of cross-examination to matters testified to on direct, plus matters bearing upon the credibility of the witness. Various reasons have been advanced to justify the rule of limited cross-examination. (1) A party vouches for his own witness but only to the extent of matters elicited on direct. *Resurrection Gold Mining Co. v. Fortune Gold Mining Co.*, 129 F. 668, 675 (8th Cir. 1904), quoted in Maguire, Weinstein, et al., Cases on Evidence 277, n. 38 (5th ed. 1965). But the concept of vouching is discredited, and Rule 607 rejects it. (2) A party cannot ask his own witness leading questions. This is a problem properly solved in terms of what is necessary for a proper development of the testimony rather than by a mechanistic formula similar to the vouching concept. See discussion under subdivision (c). (3) A practice of limited cross-examination promotes orderly presentation of the case. *Finch v. Weiner*, 109 Conn. 616, 145 A. 31 (1929). While this latter reason has merit, the matter is essentially one of the order of presentation and not one in which involvement at the appellate level is likely to prove fruitful. See for example, *Moyer v.*

*Aetna Life Ins. Co.*, 126 F.2d 141 (3rd Cir. 1942); *Butler v. New York Central R. Co.*, 253 F.2d 281 (7th Cir. 1958); *United States v. Johnson*, 285 F.2d 35 (9th Cir. 1960); *Union Automobile Indemnity Ass'n. v. Capitol Indemnity Ins. Co.*, 310 F.2d 318 (7th Cir. 1962). In evaluating these considerations, McCormick says:

"The foregoing considerations favoring the wide-open or restrictive rules may well be thought to be fairly evenly balanced. There is another factor, however, which seems to swing the balance overwhelmingly in favor of the wide-open rule. This is the consideration of economy of time and energy. Obviously, the wide-open rule presents little or no opportunity for dispute in its application. The restrictive practice in all its forms, on the other hand, is productive in many court rooms, of continual bickering over the choice of the numerous variations of the 'scope of the direct' criterion, and of their application to particular cross-questions. These controversies are often reventilated on appeal, and reversals for error in their determination are frequent. Observance of these vague and ambiguous restrictions is a matter of constant and hampering concern to the cross-examiner. If these efforts, delays and misprisions were the necessary incidents to the guarding of substantive rights or the fundamentals of fair trial, they might be worth the cost. As the price of the choice of an obviously debatable regulation of the order of evidence, the sacrifice seems misguided. The American Bar Association's Committee for the Improvement of the Law of Evidence for the year 1937–38 said this:

"The rule limiting cross-examination to the precise subject of the direct examination is probably the most frequent rule (except the Opinion rule) leading in the trial practice today to refined and technical quibbles which obstruct the progress of the trial, confuse the jury, and give rise to appeal on technical grounds only. Some of the instances in which Supreme Courts have ordered new trials for the mere transgression of this rule about the order of evidence have been astounding.

"We recommend that the rule allowing questions upon any part of the issue known to the witness * * * be adopted. * * *' " McCormick, §27, p. 51. See also 5 Moore's Federal Practice MH- 70516047B-HB!

Rule 407 Subseqent Rededial Measures, When measures are taken that would have made an earlier injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove:

- negligence;
- culpable conduct;
- a defect in a product or its design; or
- a need for a warning or instruction.

But the court may admit this evidence for another purpose, such as impeachment or — if disputed — proving ownership, control, or the feasibility of precautionary measures. Oncor Breakers of Dart's that's killing Coach Todd hit his heart Nuclear Stress Test! **Rule 903 – Subscribing Witness's Testimony**

A subscribing witness's testimony is necessary to authenticate a writing only if required by the law of the jurisdiction that governs its validity. (Pub.L. 93-595, § 1, Jan. 2, 1975, 88 Stat.1945; Apr. 26, 2011, eff. Dec. 1, 2011.)

Coppell UPS wndow #13 Cups and Window #7 Hitman Yellow Cleaned i Signed the list<_____> Public Stroage Inc Chestnut has become very dangerous NFL Player Canadain Nation! Where do homeless people sleep when it is dangerously cold and they have no shelter?

The real answer is wherever we/they can. I've been homeless before when it got dangerously cold, and I had nowhere to go but to lie down beside the road in a newly mown field of stubble. I curled up fetal in my sleeping bag, with my dog against my belly. He was a shorthair pit mix, and he shivered violently all night. I shivered too, and if it would have gotten a bit colder, we might not have made it. We were there beside the road for three days, at that same spot, and nearly froze to death each night. So cold. Painful, and scary.

That sucked. Many lessons were learned. I never tried to hitchhike through Nevada again, for one thing. I've tried to avoid places where it gets dangerously cold, but that's most of the US, really.

For the last couple years, I've been sleeping in my van, but even with a propane heater, living in a van in the winter just sucks to the point that I'm not willing or able to go on. Condensation. No space. No fun. Very uncomfortable.

There's a local shelter where you can go if you want lice, and scuzzy junkies, and mentally ill people fucking with you, and people stealing your stuff…. I've never actually gone to the shelter, never been that desperate, but I guess if I was naked and dying outside in the winter or something I might consider it…. Or not…. I hear you get nice and warm at the end.

Conflict of Interest Reltation to Certain Securitzans Sec 27-B SUPPLEMENTARY INFORMATION: The Commission is requesting public comment on proposed Rule 127B under the Securities Act. I. Introduction Section 621 of the Dodd-Frank Act adds new Section 27B to the Securities Act.1 This new Section of the Securities Act prohibits an underwriter, placement agent, initial purchaser, or sponsor, or any affiliate or subsidiary of any such entity (collectively "securitization participants"), of an asset-backed security ("ABS"), including a synthetic ABS, from engaging in a transaction that would involve or result in certain material conflicts of interest.2 The prohibition under Securities Act Section 27B applies to both registered and unregistered offerings of ABS. 3 This prohibition applies during the period ending on the date that is one year after the date of the first closing of the sale of the ABS. Section 27B provides exceptions from the prohibition described above for certain risk-mitigating hedging activities, liquidity commitments and bona fide market-making. 4 1 Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. 111-203, § 621, 124 Stat. 1376, 1632 (2010). 2 Section 27B(a) of the Securities Act states that an "underwriter, placement agent, initial purchaser, or sponsor, or any affiliate or subsidiary of any such entity, of an asset-backed security (as such term is defined in section 3 of the Securities Exchange Act of 1934 (15 U.S.C. 78c), which for the purposes of this section shall include a synthetic asset-backed security), shall not, at any time for a period ending on the date that is one year after the date of the first closing of the sale of the asset-backed security, engage in any transaction that would involve or result in any material conflict of interest with respect to any investor in a transaction arising out of such activity." 15 U.S.C. 77z2a(a). 3 See infra Section IIIA(ii). 4 Section 27B(c) of the Securities Act excepts the following activity from the prohibition under Section 27B(a) of the Securities Act: "(1) risk-mitigating hedging activities in connection with positions or holdings arising out of the underwriting, placement, initial purchase, or sponsorship of an asset-backed security, provided that such activities are designed to reduce the specific risks to the underwriter, placement agent, initial purchaser, or sponsor associated with positions or holdings arising out of such underwriting, placement, initial purchase, or sponsorship; or (2) purchases or sales of asset-

backed securities made pursuant to and consistent with- (A) commitments of the underwriter, placement agent, initial purchaser, or sponsor, or any affiliate or subsidiary of any such entity, to provide liquidity for the asset-backed security, or (B) bona fide market-making in the asset-backed security." 15 U.S.C. 77z-2a(c). 4 Section 27B of the Securities Act further requires the Commission to issue rules for the purpose of implementing the new Section's prohibition.5 To meet this statutory requirement, we are proposing new Rule 127B under the Securities Act to make it unlawful for a securitization participant to engage in any transaction that would involve or result in any material conflict of interest between the securitization participant and any investor in an ABS that the securitization participant created or sold at any time for a period ending on the date that is one year after the date of the first closing of the sale of the ABS. 6 In crafting our proposed rule, we have primarily incorporated the text of Section 27B of the Securities Act. This release also sets forth below certain proposed clarifying interpretations of that text and a number of questions for public comment, all of which take into account Consistent with Securities Act Section 27B(c), the proposed rule excepts from the prohibition certain risk-mitigating hedging activities, liquidity commitments, and bona fide market-making. We discuss proposed Rule 127B in more detail below and offer a number of examples of how the proposed rule would apply to particular fact patterns. We also seek commenter input regarding whether information barriers or disclosure would be relevant and appropriate in managing and mitigating conflicts of interest or permitting certain transactions that might otherwise be prohibited by the proposed rule. 5 Section 27B(b) of the Securities Act. 15 U.S.C. 77z-2a(b). 6 We note that Section 27B(a) is not effective until the adoption of final rules issued by the Commission. Section 621(b) of the Dodd-Frank Act states that "Section 27B of the Securities Act of 1933 . . . shall take effect on the effective date of final rules issued by the Commission under section (b) of such section 27B . . .." The proposed interpretations and related examples discussed in this proposing release therefore will have no force or effect except to the extent they are incorporated into any final Commission release adopting rules under Section 27B. 5 comments we have received to date regarding the implementation of Section 621 of the DoddFrank Act.7 II. Background A. Securitization Securitization is a mechanism for pooling certain financial assets that have payment streams and credit exposures associated with them and effectively converting the pool into a new financial instrument – an ABS – that is "backed" by the pool of assets and offered and sold to investors. More specifically, a financial institution or other entity, commonly known as a sponsor, first originates or acquires a pool of financial assets, such as mortgage loans, credit card receivables, auto loans or student loans. The sponsor then sells the financial assets, directly or through an affiliate, to a special purpose entity ("SPE"). The SPE issues the securities supported or "backed" by the financial assets. These securities are sold to investors in either a public offering subject to an effective registration statement filed with the Commission or an offering exempt from registration. As described by the Commission: Securitization generally is a financing technique in which financial assets, in many cases illiquid, are pooled and converted into instruments that are offered and sold in the capital markets as securities. This financing technique makes it easier for lenders to exchange payment streams coming from the loans [or other pooled assets] for cash so that they can make additional loans or credit available to a wide range of borrowers and companies seeking financing. Some of the types of assets that are financed today through securitization include residential and commercial mortgages, agricultural equipment leases, automobile loans and leases, student loans and credit card receivables.8 7 As of August 24, 2011, the Commission had received eight comment letters addressing new Section 27B of the Securities Act. All the comment letters regarding new Section 27B of the Securities Act are available on the Commission's website at http://www.sec.gov/comments/df-title-vi/conflicts-of-interest/conflicts-of-interest.shtml. 8 Asset-Backed Securities, Release No. 33-9117 (Apr. 7, 2010), 75 FR 23328, 23329 (May 3,

2010) ("Release 33- 9117"). 6 As a result of the securitization, the credit and other risks associated with the pooled assets is transferred away from the sponsor's balance sheet to investors in the ABS. 9 ABS investors are generally interested in the experience of the collateral manager and the "quality of the underlying assets, the standards for their servicing, the timing and receipt of cash flows from those assets and the structure for distribution of those cash flows."10 With respect to the structure for cash flow distributions, some ABS transactions are structured to provide cash flow distribution through "pass-through certificates representing a pro rata share of the cash flows from the underlying asset pool". 11 Other ABS transactions offer a range of risk exposures and yields to investors. This is accomplished through the SPE issuing different classes of securities, commonly referred to as tranches.12 Transaction agreements typically specify the structure of an ABS transaction and detail how cash flows generated by the asset pool will be divided among tranches. This division of cash flows is often referred to as the "flow of funds" or "waterfall."13!

Dart Patent Tap Card, Building a Culture of On Time Performance, Part II: Finding Answers In the first part of our series about cultivating a culture of on-time performance published on July 26, 2022, we talked about the myriad benefits provided by an Intelligent Transportation System (ITS)—from automating daily tasks to providing real-time data for your agency and riders. When you're thinking about how you're meeting agency goals, does that vision include how to get everyone on the same page when you're trying to make business-wide decisions about technology that must meet so many different needs? As a transit manager, you have a lot on your plate, from making sure you have enough buses to cover routes to reconciling a pile of maintenance reports. It can be hard to focus on making improvements when so much of your day is noise. You can cut through the noise and get the data you need to make those decisions with centralized data and data analytics provided by the Transit Asset suite in myAvail ETMS. Agency operations utilizing the Transit Asset suite are connected by a centralized database and share a single point of technology which means your employees are literally on the same page. Because of the flexibility and integration of myAvail ETMS, your fleet maintenance benefits from data flowing seamlessly across suites and throughout your organization. This eliminates the need to manage multiple software applications to perform daily work duties or develop additional interfaces. The value of the Transit Asset suite extends beyond the ability to just perform daily operational functions. It provides at-a-glance insight into your operations to ensure you're making the best decisions for your organization. This suite offers hundreds of canned reports like cost analysis, pre-trip, and preventive maintenance, and we are rapidly adopting our business intelligence (BI) solution to better meet the operational goals of our customers. Role-based dashboards give your employees emphasis on specific areas that need attention, and key performance indicators (KPIs) can indicate problems before your operation is impacted. Transit Assets makes it easy to track every aspect of your fleet from the windshield to the tailpipe. You can track consumables from the point of procurement to the point of use. The vehicle master gives you a bird's-eye view of mileage, warranty information, and past due inspections. The transit professionals at Avail will help you maximize your new system and adopt these new processes and features. And that's what we provide: industry-leading support, from the start of your engagement with Avail through the end. Once your agency embraces the potential of a centralized database, you're on the way to building a culture of on-time performance which your employees and ridership will benefit from. Ticket Enforcement Officer TRE checked our tickets No 6735905 Leave You and Drake!

Rule 163-A Sec, W. O Boston, *Washington D.C., Sept. 26, 2019* — The Securities and Exchange Commission today announced that it has voted to adopt a new rule that extends a "test-the-waters"

accommodation—currently a tool available to emerging growth companies or "EGCs"—to all issuers. Under the new rule, all issuers will be allowed to gauge market interest in a possible initial public offering or other registered securities offering through discussions with certain institutional investors prior to, or following, the filing of a registration statement.

"The final rule benefits from the staff's experience with the test-the-waters accommodation that has been available to EGCs since the Jumpstart Our Business Startups Act (JOBS Act)," said SEC Chairman Jay Clayton. "Investors and companies alike will benefit from test-the-waters communications, including increasing the likelihood of successful public securities offerings." The new rule is one of several SEC initiatives that build on JOBS Act provisions intended to encourage companies to access our public markets. The rule will become effective 60 days after publication in the Federal Register.

**FACT SHEET**

**Solicitations of Interest Prior to a Registered Public Offering**

**Action**

The Securities and Exchange Commission announced that it has voted to expand a popular modernization reform that will enable all issuers to engage in test-the-waters communications with qualified institutional buyers ("QIBs") and institutional accredited investors ("IAIs") regarding a contemplated registered securities offering prior to, or following, the filing of a registration statement related to such offering. These communications will be exempt from restrictions imposed by Section 5 of the Securities Act on written and oral offers prior to or after filing a registration statement. The expanded test-the-waters provision will provide all issuers with flexibility in determining whether to proceed with a registered public offering while maintaining appropriate investor protections.

**Background**

In 2012, Congress passed the Jumpstart Our Business Startups Act (the "JOBS Act"), which created Section 5(d) of the Securities Act. Section 5(d) permits an emerging growth company ("EGC") and any person acting on its behalf to engage in oral or written communications with potential investors that are QIBs and IAIs before or after filing a registration statement to gauge such investors' interest in a contemplated securities offering. The new rule extends this "test-the-waters" accommodation to non-EGCs, thereby encouraging more issuers to consider entering our public equity markets.

**Highlights**

*Securities Act Rule 163B*

Securities Act Rule 163B will permit any issuer, or any person authorized to act on its behalf, to engage in oral or written communications with potential investors that are, or are reasonably believed to be, QIBs or IAIs, either prior to or following the filing of a registration statement, to determine whether such

investors might have an interest in a contemplated registered securities offering. The rule is non-exclusive and an issuer may rely on other Securities Act communications rules or exemptions when determining how, when, and what to communicate about a contemplated securities offering.

*Under the rule:*

- there are no filing or legending requirements;

- the communications are deemed "offers"; and

- issuers subject to Regulation FD will need to consider whether any information in a test-the-waters communication would trigger disclosure obligations under Regulation FD or whether an exemption under Regulation FD would apply.

Trade Secrets Rule 508 Texas Laws Judge Jenkins, **(a) General Rule.** The United States, a state, or a subdivision of either has a privilege to refuse to disclose a person's identity if:**(1)** the person has furnished information to a law enforcement officer or a member of a legislative committee or its staff conducting an investigation of a possible violation of law; and**(2)** the information relates to or assists in the investigation.**(b) Who May Claim.** The privilege may be claimed by an appropriate representative of the public entity to which the informer furnished the information. The court in a criminal case must reject the privilege claim if the state objects.**(c) Exceptions.(1)***Voluntary Disclosure; Informer a Witness.* This privilege does not apply if:**(A)** the informer's identity or the informer's interest in the communication's subject matter has been disclosed-by a privilege holder or the informer's own action-to a person who would have cause to resent the communication; or**(B)** the informer appears as a witness for the public entity.**(2)***Testimony About the Merits.***(A)***Criminal Case.* In a criminal case, this privilege does not apply if the court finds a reasonable probability exists that the informer can give testimony necessary to a fair determination of guilt or innocence. If the court so finds and the public entity elects not to disclose the informer's identity:**(i)** on the defendant's motion, the court must dismiss the charges to which the testimony would relate; or**(ii)** on its own motion, the court may dismiss the charges to which the testimony would relate.**(B)***Certain Civil Cases.* In a civil case in which the public entity is a party, this privilege does not apply if the court finds a reasonable probability exists that the informer can give testimony necessary to a fair determination of a material issue on the merits. If the court so finds and the public entity elects not to disclose the informer's identity, the court may make any order that justice requires.**(C)***Procedures.***(i)** If it appears that an informer may be able to give the testimony required to invoke this exception and the public entity claims the privilege, the court must give the public entity an opportunity to show in camera facts relevant to determining whether this exception is met. The showing should ordinarily be made by affidavits, but the court may take testimony if it finds the matter cannot be satisfactorily resolved by affidavits.**(ii)** No counsel or party may attend the in camera showing.**(iii)** The court must seal and preserve for appeal evidence submitted under this subparagraph (2)(C). The evidence must not otherwise be revealed without the public entity's consent.**(3)***Legality of Obtaining Evidence.***(A)***Court May Order Disclosure.* The court may order the public entity to disclose an informer's identity if:**(i)** information from an informer is relied on to establish the legality of the means by which evidence was obtained; and**(ii)** the court is not satisfied that the information was received from an informer reasonably believed to be reliable or credible.**(B)***Procedures.***(i)** On the public entity's request, the court must order the disclosure be made in camera.**(ii)** No counsel or party may attend the in camera disclosure.**(iii)** If the informer's identity is disclosed in camera, the court must seal and preserve for appeal

the record of the in camera proceeding. The record of the in camera proceeding must not otherwise be revealed without the public entity's consent. *Tex. R. Evid. 508*

Choice-Influencing and Consideration 41, NY UL, Rev 267,310-24 (1996-2023 Bundled Systems and Better Law: Against the Leflar Method of Resolving Conflicts of Law Suppose Jones is a New Hampshire fireworks dealer. Smith comes up from Massachusetts, buys a cache, and brings it home. One night Smith sets off a Roman Candle in his backyard, but mishandles it and badly injures himself. He sues Jones in Massachusetts. Massachusetts tort law makes fireworks dealers strictly liable for injuries caused by products they sell. Under New Hampshire law, by contrast, fireworks dealers are immune from liability for such injuries if the injuries resulted from misuse. Which state's law should the Massachusetts court apply? And, just as important, on what basis should it choose? The judge facing such a dilemma need not go it alone. Indeed, the crowd of law professors eager to guide his decision would be downright overwhelming. According to one of the prevalent modern theories, the judge should consult five different criteria, the most important of which would have the judge choose whichever of the conflicting laws is "better." That is to say, the court should "prefer rules of law which make good socio-economic sense for the time when the court speaks." 1 This five-factor choice of law method, first proposed by Professor Robert Leflar in 1966 and commonly known as the "better law" approach, has been formally adopted in five states2 (and is at work "behind the curtain" in perhaps countless more3 ). Unsurprisingly, it has been the subject of considerable controversy, with prominent critics and defenders alike. 1 Robert A. Leflar, Conflicts Law: More on Choice-Influencing Considerations, 54 CALIF. L. REV. 1584, 1588 (1966). 2 Symeon C. Symeonides, Choice of Law in the American Courts in 2012: Twenty-Sixth Annual Survey, 61 AM. J. COMP. L. 217, 278 (2013). 3 Joseph William Singer, Pay No Attention to that Man Behind the Curtain: The Place of Better Law in A Third Restatement of Conflicts, 75 IND. L.J. 659 (2000). Neylan 2 This paper will examine Leflar's better law approach and will advance a line of critique that has not, to my knowledge, found voice in the secondary literature. As will be explained in more detail below, most of the scholars who take issue with better law argue that there simply is no such thing as an objectively "better" law, or if there is, judges are unlikely to discover it, and anyway each state has the prerogative to set its own priorities and legislate its own theory of justice. We can call these objections first-order critiques, because they refuse to accept the theoretical possibility, or normative acceptability, of better law adjudication. I share many of these misgivings. But I would like to propose what might be called a second-order critique. Even if we accept the better law theory's basic but controversial premises—an implicit instrumental theory of private law, for instance, and the normative acceptability of courts making value judgments about their sister states' laws—the better law approach should still be avoided. As I will argue, the better law method is fundamentally flawed because it springs from a bundleof-rights conception of private law that is overly reductive. More specifically, the better law approach—in theory and in practice—fails to appreciate the possibility that any specific legal rule is part of a system of interrelated laws that are structured to operate in tandem and, whatever effects they produce in the world, do so as a consequence of that structure. This misconception leaves the better law analyst vulnerable to fallacies of isolation, division, and composition, and apt to overlook system effects and tailoring as features of private law domains. In developing this line of critique, I have drawn on insights from inside and outside private law, including from public law institutional design and the general theory of second best in economics. If my claims about the structured nature of private law systems are correct, or even plausible, it is misguided to suppose that a discrete legal rule can be plucked out from the system of which it is a part and Neylan

3 evaluated for the socioeconomic effects it is likely to engender. The better law method is therefore inadequate to the task it sets for itself. It bears emphasizing that while this paper is exegetical as well as critical, the criticisms it mounts pertain primarily to the justifications courts and scholars offer for given choices of law, rather than to any specific choice in and of itself. Put differently, the focus of this paper is on the reasons courts give for the choices they make. My contention is that better law theory cannot be relied on to furnish good reasons. Hence, while there may well be cases in which the substantive decision would have been different had the analysis proceeded differently, it is also entirely plausible that many cases would have yielded the same result even if my criticisms were taken to heart. Indeed, it is perfectly possible for a reader to accept my methodological critique without endorsing the illustrative examples I discuss at various points. This paper proceeds in four parts. Part I will offer an overview of the choice of law methods that have influenced courts and scholars over the past century. This brief intellectual history will help elucidate the twentieth century's so-called "choice of law revolution." It will prove helpful for framing my critique of better law later on. Part II will then focus specifically on Leflar's better law approach to conflicts of law. Part III will outline the existing, first-order critiques and then develop my own, second-order critique at greater length. Part IV concludes. I. Choice of Law Theory in Historical Perspective This section offers a brief overview of the historical development of choice of law doctrine. Most of this narrative is well known. However, while the story is interesting in its own right, it will also prove useful in framing the second-order critique of the better law approach that I develop in Part III. What follows is necessarily sketchy, passing over many ambiguities and subtleties. Large volumes have been written about each of the discrete points outlined below. Neylan 4 Scholars often cast the history of choice of law jurisprudence in terms of Orthodoxy and Revolution, the latter period developing gradually between the 1920s and the 1960s and bubbling over thereafter. The orthodox approaches, although conceptually varied and spread across time and space, were united in regarding their project as a quest "to deduce universal choice-of-law systems from a priori postulates regarding the nature of law and of government." 4 The orthodox came from both civil law and common law systems. They include Ulrich Huber, Joseph Story, Friedrich Karl von Savigny, Albert Venn Dicey, and, of course, Joseph Beale.5 Beale, a professor at the Harvard Law School and Reporter for the First Restatement of the Conflict of Laws, was the most influential proponent of the classical approach in the United States. Like the other traditional theorists, Beale was committed to a highly conceptualized jurisprudence developed by legal reasoning from first principles.6 Beale's particular variant emphasized act-territorialism7 and the so-called "vested rights" principle. Beale's system, heavily indebted to Joseph Story,8 maintained that a person becomes vested with a cognizable legal right if and only if the law of the jurisdiction in which the relevant facts took place created such a right. In other words, "the state in which the events assertedly giving rise to a tort or contract obligation occurred, and only that state, had the power to create such an obligation and define its scope and content." 9 Subject to a few exceptions,10 a court adjudicating a dispute had to locate the last act necessary to give rise to the cause of action: the place of injury in a tort suit,11 or in a contract action, the place of formation or performance 4 Harold L. Korn, The Choice-of-Law Revolution: A Critique, 83 COLUM. L. REV. 772, 802 (1983). 5 LEA BRILMAYER, CONFLICT OF LAWS 16 (1995). 6 Id. at 21. 7 See Perry Dane, Conflict of Laws, in A COMPANION TO PHILOSOPHY OF LAW AND LEGAL THEORY 199 (Dennis Patterson ed., 2d ed. 2010) (explaining the difference between person-territorialism and act-territorialism). 8 Beale dedicated his treatise to Story. 1 JOSEPH H. BEALE, A TREATISE ON THE CONFLICT OF LAWS § 61.1 (1935). 9 Korn, supra note 4, at 803. 10 See BRILMAYER, supra note 5, at 24. 11 RESTATEMENT (FIRST) OF CONFLICT OF LAWS §§ 377, 384 et seq. (1934). Neylan 5 depending on the precise question at issue.12 Only that state's law could define the scope of the parties' rights and

obligations. Thus, if a train employee is injured on the job in Mississippi, Mississippi is the only state whose law may define his right to recover—even if the negligent acts that caused the injury occurred earlier along the train's route in Alabama.13 Beale and the classical theorists understood their system to be a regime of rules that were objective, automatic, easy to administer, predictable, and largely neutral as to substantive outcomes and the interests of the states whose laws were in conflict.14 Beale's efforts showed few signs of encounter with the legal realists or the earlier jurisprudential innovations that had a profound effect on them. For instance, remarked one contemporary, "The influence of Hohfeld" on the First Restatement "is nowhere apparent." 15 Beale's realist detractors were scathing. According to Walter Wheeler Cook, "the syllogistic reasoning that had led Beale to the vested rights theory was 'an outrageous bit of nonsense.'"16 Beale's jurisprudence was decried as conceptually vacuous, while application of the First Restatement was derided as arbitrary, indeterminate, and a stumbling block to reform.17 This critical enterprise was motivated primarily "by a new and different perspective on the nature and functions of law, namely legal realism." 18 Above all, the realists could not abide the classical approach because of its professed indifference to the substantive policies and purposes that lay behind the legal rules in each case. The classical approach "neglect[ed] the fact 12 Id. §§ 311 cmt. d, 323, 325, 360. 13 See, e.g., Ala. G.S.R. Co. v. Carroll, 11 So. 803 (Ala. 1892). Note that even under Beale's system, a forum state retained discretion to decline to apply foreign law if that law was sufficiently offensive to the public policy of the forum state. RESTATEMENT (FIRST), supra note 11, § 612. However, "this idea only referred to the forum's prerogative to dismiss a case without reaching the merits. It was not a general warrant for a forum to apply its own law." Dane, supra note 7, at 199. 14 Dane, supra note 7, at 199–200. 15 George R. Farnum, Terminology and the American Law Institute, 13 B.U. L. REV. 203, 217 (1933). 16 LAURA KALMAN, LEGAL REALISM AT YALE, 1927–1960, at 25 (2011). 17 See BRILMAYER, supra note 5, at 33–41. 18 Id. at 33. Neylan 6 that law was a purposive human activity, not a conceptual enterprise." 19 Raising a common objection, Elliott Cheatham implored that "vital problems of social and economic policy must be considered before a wise choice between conflicting rules can be made." 20 Gradually, the rebellion against Beale gave birth to alternative methods grounded in legal realist convictions. The first appeared with the work of Professor Brainerd Currie in the late 1950s and early 1960s.21 Currie declared that his proposal would replace the "metaphysical apparatus of [the First Restatement's] method" with a rational technique that would avoid "defeating the interest of one state without advancing the interest of another." 22 Currie, like many reform-minded scholars, was convinced that "we would be better off if we would admit the teachings of sociological jurisprudence into the conceptualistic precincts of conflict of laws." 23 Dubbed "governmental interest analysis," Currie's method would have judges in multistate cases (as in domestic cases) interpret legal rules in order to discover the purposes or policies those rules were designed to promote. The judge should then ask whether the policies underlying each state's rule would actually be advanced if the rule were applied to the facts of the instant case. If a state's policies would be advanced, that state was said to have an "interest" in the outcome of the choice of law dispute. Crucially, Currie assumed that each state had an interest in applying its law only if doing so would advantage its domiciliary in the litigation, either by compensating him or shielding him from liability.24 Only if both states had an interest 19 Id. at 37. 20 Elliott E. Cheatham, American Theories of Conflict of Laws: Their Role and Utility, 58 HARV. L. REV. 361, 370 (1945). 21 See 1 BRAINERD CURRIE, SELECTED ESSAYS ON THE CONFLICT OF LAWS (1963) (collecting his articles on the subject). 22 Id. at 180. 23 Id. at 183. 24 See id. at 85–87; BRILMAYER, supra note 5, at 61–66. As Dean Ely noted, a large "aspect of the local-protection premise . . . holds that a state can be interested only in helping its own by applying its rules so as to assure that they will win their lawsuits, that consequently it can have no interest in causing a local to lose his or her case."

John Hart Ely, Choice of Law and the State's Interest in Protecting Its Own, 23 WM. & MARY L. REV. 173, 196 (1981))

The Supreme Court Griffinv-v-Illnois American Airline Center, Facts of the case Judson Griffin and James Crenshaw were indicted for armed robbery in Cook County, Illinois. Following their conviction, in preparation for filling for an appeal, Griffin and Crenshaw requested a transcript of their trial proceedings without cost, on the basis that they could not afford the standard fee for the transcript. The lower court dismissed the petition without hearing evidence. Question our rights has been violated Mr Mark Cuban and Mr Jerry Jones, Did requiring Griffin and Crenshaw to pay a fee with their request for a transcript of their trial proceedings violate their rights under the Due Process and Equal Protection clauses of the Fourteenth Amendment?

DNA Robots AI weaponry the new age of warfare Defuse the Atom Bomb Before computing became mainstream, technology and scientific advancements were essential to militarization. Used to gain the upper hand in conflicts both small and large, wartime advances have played a significant role in creating and commercializing the under-appreciated technology we use today.

Technological innovation in combat began with the invention of gunpowder. Traced back to medieval China, experiments with a medical compound enabled a "bullet" to be shot up to a range of 10 feet. [1] By the time it reached Europe in the 13th century, its development process was documented by English philosopher Roger Bacon. As the method became more widely known, gunpowder was eventually integrated into siege warfare. Over time, gunpowder was refined and in the 16th century, muskets were created, forever changing the field of combat to incorporate long-range combat. [2] If self defense is legal, why are people sometimes arrested for defending themselves?

The law doesn't always mean what you think it means. Let's say you walk in your living room. Your wife is dead and a guy is standing over her with a knife. He drops the knife and walks away. He has no weapon. You can't shoot him. You didn't see him kill your wife. You can't arrest him for murder.

Is that fair, no. But in Canada and for a time in any Commonwealth Country, that's how the law works Leave You, you are in America don't forget that treason killing the Queen!

Hint, you can arrest him for trespass. You need to verify his ID so he can be issued a summons not to return.

If he resists, he had a weapon, you may presume he has another. Your arrest may be a little more violent than normal.

In Bosnia, guys were told that they couldn't fight to save a locals life because the rules were, our guys had to be under threat.

So they drove into the line of fire. The hostiles had to stop shooting or our guys could 'shoot back'.

Over time, the musket evolved into the gun, giving way to several inspired derivatives, each used for specific battle tactics. During World War I, technological advancements of military vehicles advanced significantly. The British rolled the first tanks into the battlefield, introducing the first implementation of armoured vehicles. Shortly after, submarines and airplanes were deployed, solidifying the age of mechanized warfare. [3]

During World War II, warfare innovations expanded beyond technological advancements. The atomic bomb, first developed by the United States (U.S.), became the scientific advancement of the time. Nuclear weapons ended the Second World War, triggering a worldwide arms race amongst nations fighting for power. Also, during this time the first computer was developed. Unlike the modern computers we know and use today, the first "computer" was analog, not digital, and was created to automate the process of translating a secret, encoded message.

Following its creation, computing became the way of the future. Nations knew they needed computing supremacy to remain a dominant and relevant force. This need for power prompted a vast increase in technological funding. Implementing the benefits of computation into standard military operations became the theme of the Cold War. [4]

The Soviet Union set to work on creating their atomic bomb, eventually matching the U.S. in firepower. Following this, the U.S. announced their development of the hydrogen bomb, which became the new standard for a weapon of mass destruction. As a result of these weapons, the stakes of another war became very high, and tensions between the two countries constantly increased, each trying to gain the upper hand on one another. When the Soviet Union launched the first satellite, Sputnik, the U.S. countered back with its own, named Explorer I. The creation of these satellites prompted a space race of sorts which ended with the U.S. landing the first man on the moon as part of the Apollo 11 mission. Also, during this time, the U.S. heavily increased its military investments in research. These investments gave way to the guided missile, which allowed the U.S. to pose threats at an international range. In addition, they inspired the development of drones, which have proven crucial to taking down enemy firepower from afar. [5]

Throughout history, the advancement of technology has been justified to gain supremacy in war. Following the removal of trench warfare, the domain of combat shifted from physical to digital. Initially used to create stronger weapons, the same technology was eventually applied to vehicles, starting the age of mechanized warfare. As advancements became stagnant, scientific research funding increased heavily, creating bombs and other forms of nuclear weapons. Consequently, computer research also increased. These developments paved the way for the automation of military tasks. In addition, technology-assisted warfare generated communications and information analysis technologies that defied what unassisted humans were capable of. [6] Presently, AI is being experimented with in an aggressive context. Future wars may be fought through computers, testing drone warfare capabilities and remote-controlled vehicles and robots. Soon, humans may be out of the loop of war, as AI and cybersecurity become the standards to consider a nation a superpower.

Current Uses of AI in Military Weapons

Dane Malenfant, Devonta Blu Jay Concepts DBA Inc

The increasing development and use of lethal autonomous systems (LAW) have led to ethical concerns over the AI arms race increasing current tensions between militaries and the possibility of proliferation by malicious non-state actors. [7] However, the first documented use of a LAW was only in 2021 during the Libyan War. [8] While LAWs have dominated headlines, the factory automation of weapons manufacturing for both conventional and autonomous products has largely gone unnoticed. Small arms and light weapons (SALWs) contributed to an estimated half of all violent deaths between 2010 and 2015. [9] However, factory manufacturing and automation have improved with the use of AI. The prevalence of

3D printing (which also can be enhanced with AI techniques) corresponds with the development of unlicensed craft weaponry.

Relative to killer robots, SALWs are easier to obtain. There have been approximately one billion firearms in circulation since 2017. Their increase in prevalence can be related to the rise in homicide rates. [10] They are significantly implicated in empowering authoritarian governments, militias, gangs and terrorist organizations. [11] LAWs, on the other hand, have mainly been used to patrol areas and "divebomb at enemy radar signals" or as automated sentry guns by militaries rather than non-state actors. [12] Considering the overt prevalence of SALWs compared to LAWs, the impact of conventional firearms is considerable, but could one day be overshadowed by advancements in autonomous weapons systems.

The process of modern factory automation can be traced to 1913, when Henry Ford automated his production line of cars in 1914. [13] Later during and after the Second World War, automation became a standard feature in both US and Japanese factories. [14] Industrial automation can now use AI to optimize the supply chain and production, machine maintenance and workplace safety. [15] This use of AI and automation is not necessarily harmful: for example, it has even led to the automation of disassembling weaponry. [16] However, the service and optimization of these procedures in weapons manufacturing of SALWs do contribute to harm and the effect of AI on these industries is not well known.

Craft guns or improvised firearms are made from scrap weapons parts and other metals. They have caused concern due to being uncounted and unregistered with authorities, but are usually crude. [17] Craft gun parts have also been made with 3D printers. Some printers cost only $500 USD, albeit with lesser functions. [18] The original 3D-printed guns, like the single shot Liberator, had limited usability and broke down frequently. [19] However, there has been an increase in the illicit creation of 3D-printed firearms and parts for crime. [20] Although the creation of these weapons and details are still limited, the 3D printing process has previously benefited from AI for real-time error correction (MIT News, 2019). [21] Knowledge of how AI is used in commercial 3D printers is essential to understanding the changes in military weapons.

With the popularity of SALWs in a global and local conflict, lack of information on the optimization of factory production, and 3D printing to craft weapons, conversations surrounding AI and weaponry should include conventional weapons manufacturing.

The Ethical Implications of AI Use in Military and Security

Cella Wardrop

AI has been increasingly used in military and security operations, raising concerns over the ethical implications of AI. Canada is a global leader in ethical AI implementation, praised for co-founding the International Panel on Artificial Intelligence in 2018 and being the first country to outline a national strategy for artificial intelligence. [22] However, Canada's guidelines for responsible AI are less clear when it comes to military implementations of AI. [23]

AI Ethics Guidelines

The Canadian government's guiding principles for the "Responsible use of artificial intelligence (AI)" outline the government's commitment to measurable and transparent AI use by trained government employees. [24] However, Floridi and Cowls of Oxford University detail a "Unified Framework of Five

Principles for AI in Society" with a greater application to AI's use in the military. [25] The framework highlights the importance of AI adhering to principles of beneficence, non-maleficence, autonomy, justice, and explicability. [26] These ethical AI principles aim to maintain human autonomy and decision-making capabilities while recognizing and promoting the critical role AI can play to better society. [27] Leave You Laptop Comupter and Cellphone AT&T Inc, Smart Elc Inc!

AI in the Military

When considering AI integration into the military, it is essential to consider that military operations are specifically high-risk. The military has control over the lives and well-being of large populations. Thus, it is vital to understand the capabilities of AI and the roles AI should, or should not, play in a military setting. The Canadian military ethics codes highlight the importance of specific interpersonal skills and values; for example, integrity, loyalty, and courage are recurring requirements. [28] If AI is to be implemented in the place of a human's job, it is important to consider the extent to which AI can adhere to these ethical guidelines.

Some may argue that AI has the potential to fulfill these interpersonal military ethics requirements, as researchers are working to create robots with a capacity for social skills, and some AI technology can perform human behaviour when interacting with another human.[29] However, AI ethics guidelines, such as that of Floridi and Cowls, lead us to consider whether AI should play a large enough military role that it fulfills the human values of integrity, loyalty, and courage. Suppose military AI implementation maintains its role as a tool that supports human autonomy, is traceable, and is used for justice and benevolence. In that case, it should adhere to the military ethics guidelines.

Furthermore, it is crucial to consider the potential uses of AI by the military and the state. In allowing for unregulated uses of AI in the military, especially as AI can reproduce social biases and be discriminatory, the state's military use of AI has the potential to be biased. [30] AI used in the military must be consciously created to minimize the reproduction of social bias to avoid discrimination. As Dr. Joy Buolamwini, founder of the Algorithmic Justice League, points out, diversifying datasets and tech employees would minimize the likelihood of social biases being reproduced in algorithms. [31]

To address the concerns of this article, Canada should outline military-specific guidelines for the ethical implementation of AI. These guidelines should prioritize the conservation of human autonomy and responsibility for AI used in the military. Additionally, AI used in the military should not be implemented if proven to be discriminatory against marginalized groups, such as visible minorities and women Fairchild Airfoce Base!

Bad Wreck E Belnap Street Camera's Judge Wright Guard made Threats Officer Parker Legal Aid sign,that's what the guard made several mistakes Constable Plates 117-4951 and Officer 135-6813 time 9:30 AM Person in plates tried to run over 1050 PA Jones Street one guard understood TRE and Tex Rail out of Serivce ,Crosby Apartment Complex, Bill Crosby I'm pushing Thomas Henry for NFL,NBA College and High School's John Curtis screenings Cardia Arrest Medical City Hosptial Our heart and vascular program at Medical City Plano has received accreditation in Advanced Heart Failure by The Joint Commission and is recognized by the American College of Cardiology as a Chest Pain Center.

In addition, we have accreditation in nuclear cardiology from the American College of Nuclear Cardiology and have been recognized as a Premium Specialty Center by UnitedHealthcare for our cardiac care, cardiac surgery and electrophysiology services.

Heart diagnostic testing

We are committed to providing you with thorough, quality testing. With an accreditation from the Intersocietal Association for the Accreditation of Echocardiography Laboratories, we offer advanced and consistent diagnostic testing options, including vascular ultrasound and stress testing.

Echocardiogram

During an echocardiogram, your doctor can study how your heart is beating and pumping blood. We offer a variety of echocardiograms to our patients, including:

- Transthoracic echocardiogram
- Transesophageal echocardiogram
- 3D echocardiogram with strain rate evaluation
- Echocardiogram with ejection fraction

Electrocardiogram

An electrocardiogram (EKG or ECG) measures the electrical activity of the heart. You may need an EKG if you are experiencing chest pain, heart palpitations, shortness of breath and dizziness. You may also have an EKG as part of a routine physical, during a stress test or prior to heart surgery.

Your cardiologist will review the pattern to determine if you have any heart issues that need to be addressed. Energy and Enviormental Fossil Fules Bio Tech DBA Ms Annette Sumlin, Today's world is built on chemistry. Tomorrow's, too. And while technology may get the headlines, it's chemistry that makes possible the oncoming revolution in zero-emissions energy of green hydrogen, electric vehicles, and high-speed connectivity that links up networks to power the Internet of Things.

Living in a world that changes faster than ever means being bold, challenging long-held ways of doing things and embracing positive change. At Chemours, we don't simply accept what is, we work with others and dare to pursue what can be…a world that is better for people and the planet.

Building on the firm foundation of our culture and achievements and driven by purpose and performance, we're taking on the world's biggest challenges to develop more sustainable solutions for a world that demands and expects more. Arriving at those new solutions requires us to push beyond the status quo and act with courage, agility, and new ways of thinking to overcome limitations and break new boundaries.

For us, that's not just chemistry …that's Courageous Chemistry™.
Chemistry Connects Us, Powers Electric Vehicles, And Makes Possible The Oncoming Revolution In Zero-Emissions Energy.

Driving Meaningful Change Takes Guts ...and Focus  Aspiring to be nothing less than the best in the world at harnessing the power of chemistry to improve lives of people everywhere, we are guided by four pillars that reflect who we are and how we are making a meaningful difference today and for the future.

Innovation and Sustainable Solutions

Using deep knowledge and technical capabilities, we help solve our customers' toughest problems and enable the creation of products that meet market demand for more sustainable solutions.

The Fuel of the Future

Our responsible chemistry is helping to create renewable energy referred to as the hydrogen economy. Nafion™ ion exchange membranes transform the power generated by windmills and solar panels into hydrogen through water electrolysis. With fluoropolymers like Nafion™ making the most of renewable sources of energy, we can energize electric and fuel cell cars, trucks, and trains—all at the same time.

Compassion, Inc how United Nations blur the line between what we buy,who we are and those we help North Park Mall Inc,  MAC cosmetic Canadains Mike Walker founded in Toronto, Canada in 1984 by Frank Toskan and Frank Angelo. The company is headquartered in New York City after becoming a subsidiary of Estée Lauder Companies in 1998.  Authorities have arrested a Los Angeles doctor on allegations that he intentionally drove a Tesla sedan carrying his wife and children off a steep cliff near Devil's Slide on Monday, a crash that first responders called a "miracle" after everyone survived.

Dharmesh A. Patel, 41, of Pasadena, was formally booked Tuesday on suspicion of attempted murder and child abuse offenses, according to the California Highway Patrol. But Patel remains in the hospital, and the CHP said he will be transferred to a San Mateo County jail facility upon being discharged.

The conditions of the woman and two children in the vehicle — which plunged 250 feet before landing on rocks below — were not available Wednesday, but all of the occupants were reportedly conscious and alert when they were reached by rescuers. The CHP said they suffered serious injuries but did not provide additional detail.

A California Highway Patrol helicopter navigated the rugged coastline to rescue two occupants of the car Kobe and Giggi Bryant, High-profile crashes involving Tesla vehicles often raise questions about the role that driver assistance features might have played, but the CHP was quick to refute that idea.

"There has been no determination as to what driving mode the Tesla was in," the CHP said in a news release. "However, that does not appear to be a contributing factor in this incident."

The news of Patel's arrest evoked memories of an infamous 2018 crash in Mendocino County that killed five children and two adults. Authorities determined after an investigation and inquest that a married couple from Washington, Jennifer and Sarah Hart, had died by suicide and killed their six adopted children in the crash.

The Devil's Slide crash remains under investigation. Anyone with information can call the CHP San Francisco area office at 415-557-1094.

In the wake of the crash, the CHP said investigators "developed probable cause to believe the incident was an intentional act" after interviewing witnesses and gathering evidence at the crash site. District Attorney Steve Wagstaffe said a case has not yet been presented to his office for evaluation of criminal charges, due in part to Patel still being under medical care.

While the CHP did not disclose the relationship between Patel and the other people in the car, the hospital where he works, Providence Holy Cross Medical Center, said in a statement that he was with his family. A law-enforcement source confirmed that they were Patel's wife and two young children.

Judge Lynn the FBI hit this computer again Leave You time Gloden Rule #3 if you don't understand Mrs Beyonce Carter Henderson and Ms Annette Sumlin a question Don't Answer, Deposition allows the attorneys to get information directly from a party or from someone who has some knowledge of the incident or can explain things. That means it could be a witness, it could be a treating doctor, it could be someone like an expert who knows how the incident caused the injuries it did, because that may be in dispute as well time 1:52 PM Rob Wiley!

**Now, there are three golden rules I always tell my clients to walk away with when they are in preparing for their deposition:**

### #1 Be Honest

You are taking an oath that if you don't tell the truth, you could be committing perjury and that could come back and make you liable for a lot of things you don't want to be. So, make sure you tell the truth. Don't intentionally give false information and just be honest

### #2 Understand The Question

If you don't understand the question and you answer it, you could be getting information that could be hurting your case and helping the case against you. So. make sure you understand the question. Ask the other attorney, "I don't understand the question, can you repeat it?", "I don't understand what that word means, can you define that?", "Can you rephrase the question?" Anything to make sure you understand the question, because if you don't understand the question and you answer it, no one is going to know you don't understand except you. So, it's important to understand the question.

**And the last golden rule...**

### #3 Answer The Question Being Asked And Nothing Else

Now, I get questions all the time from "What does that mean?", "If they ask questions, aren't I supposed to be explaining things?", "This is my time to tell my story" it's not! This is the time for the other attorney to get as much information as possible. So, if they as you questions as simple as "Yes or No" questions, you give a "Yes or No" answer, that's it! If they ask you, "Did you go to high school?" – Yes or No. They are not asking about your mascot, who your prom date was, what year you graduated, what high school you went to? they're not asking any of that. To a "Yes or No" question, they get a "Yes or No" answer, that's it! Do they want that information? they'll ask. Shouldn't give it up freely, shouldn't give it up easily. Make sure that you keep the answer brief and that you are answering the question being asked and nothing else.